**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **YEETTA L. WARD**, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1612 (TSC) |
| | ) | |
| **DISTRICT OF COLUMBIA,** | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Yeetta Ward brings this action against the District of Columbia pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12111, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq.*; and the Civil Rights Act of 1991, 42 U.S.C. § 1981a, for failure to provide reasonable accommodations, retaliation, and hostile work environment. Following the close of discovery, Defendant moved for summary judgment. For the reasons stated herein, Defendant's Motion will be GRANTED in part and DENIED in part.

## I.     BACKGROUND

Plaintiff is a former employee[1] of the District of Columbia's Department of Youth Rehabilitation Services ("DYRS") who, during the period at issue, worked as a Youth Correctional Officer, alternatively known as a Youth Development Representative. (Am.

---

[1] Plaintiff no longer works for DYRS, but the circumstances surrounding her departure are unclear.

Compl. ¶¶ 12–13).  In this position, she was responsible for supervising youth who were in the care and custody of the Department of Youth and Rehabilitation Services.  (Pls. Statement of Material Facts (hereinafter Pls. SMF) ¶ 2).  Plaintiff has been diagnosed with major depressive disorder, post-traumatic stress, anxiety, and panic disorders, all of which are controlled with medication and psychotherapy.  (Pls. SMF ¶ 1; Am. Compl. ¶ 15).

Plaintiff alleged that two DYRS co-workers—Jeffery McInnis and Sharon White-Pulley—harassed her based on her gender in 2005 and 2006.   Plaintiff filed a lawsuit against DYRS in 2010, raising retaliation and hostile work environment claims, but the court rejected her claims and granted summary judgment for DYRS.  *See Ward v. District of Columbia*, 950 F. Supp. 2d 9, 11–13, 23 (D.D.C. 2013).[2]

From approximately 2011 through 2012, Plaintiff apparently did not encounter either of the alleged harassers at work, but on or around April 30, 2012, Plaintiff suffered a "mental breakdown" after she came in contact with McInnis at work.  (Ward Dep. 49).  Following the mental breakdown, Plaintiff's therapist informed DYRS that Plaintiff's condition warranted her taking leave, and Plaintiff notified DYRS that she would be using her earned sick leave.  (Am. Compl. ¶¶ 17–18).

Contemplating her return to work, on August 3, 2012, Plaintiff requested workplace accommodations from DYRS.  Specifically, Plaintiff sought: (i) to avoid work that placed her in contact with McInnis or White-Pulley; (ii) to take liberal leave for the purpose of attending

---

[2]    In that lawsuit, Plaintiff alleged that McInnis triggered a metal detector at work and commented to Plaintiff that it "must be the metal in my drawers."  *Ward*, 950 F. Supp. 2d at 11.  He later allegedly told Plaintiff: "I want you to use your hands and pat me down."  *Id.*  Sometime later, after Plaintiff complained to DYRS about McInnis's comments, White–Pulley allegedly insulted Ward on a regular basis by referring to her as "baldy," "mini-me," and "big mouth."  *Id.* at 12.

medical appointments; (iii) exemption from working overtime in excess of her normal eight-hour shift; and (iv) exemption from working weekends.  (Defs. Ex. A).  On August 30, 2012, Satina Smith, a DYRS Management Liaison Specialist, sent a letter denying Plaintiff's request for exemption from overtime and weekend work, citing DYRS's Overtime Draft Procedures.  (Defs. Ex. B).  Instead, DYRS offered to transfer Plaintiff to an eight-hour midnight shift (10:45 p.m. – 6:45 a.m.) as a reasonable accommodation, reasoning that this would give Plaintiff the time and flexibility to attend medical appointments, and allow her to avoid working with McInnis and White-Pulley (who both worked daytime shifts).  (*Id.*)  Smith also advised Plaintiff that DYRS would consider her absent without leave if she did not return to work on September 2, 2012.  (*Id.*)  Smith concluded the letter by asking Plaintiff to make contact so that they could "discuss further arrangements to return to work."  (*Id.*)

Plaintiff informed DYRS that, pursuant to her doctor's orders, she would not be able to return to work on September 2 and therefore requested leave under the Family and Medical Leave Act ("FMLA") so that she would not be considered absent without leave.  (Am. Compl. ¶ 27).  Approximately one week later, on September 7, 2012, Plaintiff's therapist sent a letter to DYRS explaining that Plaintiff was "unable to work any [shifts of longer than eight hours] until she [was] mentally and emotionally stronger."  (Pls. Ex. 13).  The therapist also explained that Plaintiff's medical team was trying to stabilize her sleep patterns with medication, and such a goal could not be achieved if she were to work on the night shift.  (*Id.*)  Finally, the therapist recommended that DYRS allow Plaintiff to work from 6:30 a.m. to 3:00 p.m. on Sunday through Thursday, which would allow her to keep her medical appointments and stabilize her sleep patterns.  (*Id.*)

Plaintiff testified at her deposition that she was able to work the Sunday through Thursday shift, but working on those days still exposed her to McInnis and White-Pulley. (Ward Dep. 51–52). In both her Complaint and her brief, Plaintiff contends that the solution to this problem would have been to transfer her to another position or location. (Am. Compl. ¶¶ 35–37; Pls. Br. 25; *see* Ward Dep. 45, 100; Ohler Dep. 26–28).

After receiving Plaintiff's FMLA request, DYRS determined that she had sufficient medical documentation to support her request and informed her that the leave would be applied retroactively to April 30, 2012—the date of her emotional breakdown. (Pls. Ex. 26). However, on September 16, 2012, Plaintiff reported for the midnight shift, under what she construed as a "threat of disciplinary action." (Pls. SMF ¶ 19). The shift supervisor told Plaintiff that DYRS had no information regarding her changing to the midnight shift and sent Plaintiff home. (Pls. Ex. 27; Ward Dep. 61). Subsequently, DYRS sent an email to Plaintiff explaining that since she had not responded to Smith's offer to move Plaintiff to the midnight shift, no scheduling changes were ever made. (Pls. Ex. 27; *see* Defs. Response to Pls. SMF ¶ 19).

What happened next is unclear, but Plaintiff alleges that at some point after the midnight shift incident, DYRS placed her on what she describes as "administrative leave." (Ward Dep. 66, 74). DYRS then required that Plaintiff undergo a "Fitness-for-Duty Examination" before she could return to work. (*See* Pls. Ex. 20; Pls. SMF ¶¶ 15, 30). According to Plaintiff, DYRS did not impose such a requirement on other employees. (Pls. SMF ¶¶ 15, 30).

Plaintiff returned to work on October 18, 2012, after which DYRS required that she work more than eight hours per day and denied her requests for leave to attend medical appointments. (Am. Compl. ¶ 34; Ward Dep. 8–9, 72–73, 76). During this time, DYRS frequently transferred her to various positions and, approximately one year later, reassigned her to the position of

4

Transportation Dispatcher.  (Pls. Ex. 3, Interrog. 5; Am. Compl. ¶ 35).  It is unclear from the record whether this new assignment involved relocation to another facility, but the transfer allowed Plaintiff to work eight-hour weekday shifts.  (Am. Compl. ¶ 35).  The parties do not indicate whether this new assignment also allowed Plaintiff to avoid contact with McInnis and White-Pulley.  Plaintiff filed this action shortly after the final transfer, alleging that DYRS: (1) discriminated against her by failing to provide reasonable accommodations; (2) retaliated against her; and (3) created a hostile work environment.

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).  The non-moving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).  "[A]t the summary judgment stage the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### III.    ANALYSIS

#### A.    <u>Disability Discrimination for Failure to Accommodate (Count I)</u>

Plaintiff first alleges that DYRS discriminated against her by failing to reasonably accommodate her disability.  An employer violates the ADA when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."  42 U.S.C. § 12112(b)(5)(A).  "The term 'qualified individual with a disability' means 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'"  *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007) (quoting 42 U.S.C. § 12111(8)).  Therefore, to survive a motion for summary judgment, Plaintiff must "come forward with sufficient evidence to allow a reasonable jury to conclude that (i) she was disabled within the meaning of the [law]; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability."  *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (citations omitted).  DYRS asserts that Plaintiff could not perform the essential functions of her job and that DYRS did provide her with a reasonable accommodation, which she declined.

#### 1.    Essential Functions of Plaintiff's Job

DYRS argues that Plaintiff was unable to perform the essential functions of her job with or without a reasonable accommodation because all YDR employees are required to work

overtime and weekends as a condition of employment.  Plaintiff disputes that overtime and weekend work are essential functions of her employment.

"Employers enjoy 'substantial deference' in defining essential functions."  *Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015) (citation omitted).  Under 29 C.F.R. § 1630.2(n)(3):

> [e]vidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

a.  Overtime Work

In support of its argument that overtime work (more than eight hours per day) is an essential function of Plaintiff's job, DYRS proffers a document entitled "Overtime Draft Procedures."  (Defs. Mot. for Summ. J. 7; Defs. Ex. C, Section II).  While the Procedures provide that "all [staff] are required to work mandatory overtime as a condition of employment," (Defs. Ex. C, Section II), Human Resources representative Catherine Ohler testified that exceptions to the overtime draft policy are made "on a case-by-case . . . basis."  (Ohler Dep. 32).  Additionally, DYRS documents in the record indicate that the agency exempted at least eight employees from the overtime requirement.  (Pls. Exs. 5–7).  In light of this evidence, the court finds that a genuine issue of material fact exists with respect to whether the overtime requirement was an essential function of Plaintiff's job.[3]

---

[3]   The overtime work "requirement," which prevented Plaintiff from attending medical appointments, overlaps with Plaintiff's request that DYRS allow her to take liberal leave in order to attend these appointments.  Thus, the court's analysis on the overtime issue likewise applies to Plaintiff's request for accommodations to take liberal leave.

b.  <u>Weekend work</u>

Unlike the overtime issue, summary judgment is appropriate on the issue of Plaintiff's

request to avoid weekend work because she ultimately withdrew that request.  In response to

DYRS's August 2012 letter offering an accommodation in the form of night-shift work,

Plaintiff's therapist sent a letter to DYRS rescinding Plaintiff's request to avoid weekend work.

In that letter, the therapist explained that Plaintiff's treatment would be jeopardized by working

the night shift, working more than eight hours in a day, as well as exposure to McInnis and

White-Pulley.  (Pls. Ex. 13).  On the other hand, the therapist indicated that working on

weekends would not hamper Plaintiff's treatment:

> I have spoken with Ms. Ward about her work schedule and she has advised that her
> previous work schedule was conducive and acceptable to the continue[d] treatment
> needed, which is 6:30 am to 3:00 pm Sunday [through] Thursday.  <u>I believe Ms.
> Ward is able to work this shift without any problems</u>.  This shift allows her to keep
> her medical appointments and stabilize her sleep patterns.

(*Id.*) (emphasis added).  At her deposition, Plaintiff admitted that she agreed with the therapist's

observation about working the Sunday through Thursday shift "without any problems," except to

the extent it exposed her to McInnis.  (Ward. Dep. 51–52).  Given this evidence, the court finds

that Plaintiff does not have a viable failure to accommodate claim with regard to her request to

avoid working on the weekend, and the court will grant summary judgment to DYRS on this

issue. [4]

---

[4]    Had Plaintiff not withdrawn her accommodation request to avoid weekend work, the court
would have found that a genuine issue of material fact existed on this issue.  DYRS's policy
document indicates that the agency requires a "[r]otational tour of work normally requiring
rotation on each of three tours —AM, PM, Midnight—seven days per week, and holidays."
(Defs. Ex. D).  Weekend work that is "normally" required does not suggest that weekend work is
an essential function of the job, particularly in light of Ohler's testimony that exemptions from

**2.  DYRS's Proposed Reasonable Accommodation/Undue Hardship**

DYRS's argues that it provided Plaintiff with a reasonable accommodation—transferring

her to the midnight shift.  Under the ADA, reasonable accommodations may include:

> job restructuring, part-time or modified work schedules, reassignment to a vacant
> position, acquisition or modification of equipment or devices, appropriate
> adjustment or modifications of examinations, training materials or policies, the
> provision of qualified readers or interpreters, and other similar accommodations for
> individuals with disabilities.

42 U.S.C. § 12111(9)(B).[5]  When determining how to address a reasonable accommodations

request, the employer and employee must engage in an interactive process.  29 C.F.R.

§ 1630.2(o)(3).  The interactive "process contemplated is 'a flexible give-and-take' between

employer and employee 'so that together they can determine what accommodation would enable

the employee to continue working.'"  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)

(quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

If, after engaging in the interactive process, an employer refuses to provide the requested

accommodations, the employer must show that acquiescing would have caused an "undue

hardship."  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) (citing 42 U.S.C. §

12111(10)(B)).  "In determining whether an accommodation would impose an undue hardship on

a covered entity, factors to be considered include":  (1) "the nature and cost of the

accommodation"; (2) "the effect on expenses and resources"; (3) "the overall size of the

---

weekend work are "done on a case-by-case basis and a person-by-person basis."  (Ohler Dep.
30).

[5]    For disability discrimination claims, the Rehabilitation Act "as amended, directs courts to
employ the standards of the Americans with Disabilities Act of 1990."  *Solomon*, 763 F.3d at 5.
Similarly, "[w]hen evaluating claims brought under the DCHRA, 'decisions construing the ADA
[are considered] persuasive.'" *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir.
2015) (quoting *Grant v. May Dep't. Stores Co.*, 786 A.2d 580, 583 (D.C. 2001)).

business . . . with respect to the number of its employees"; and (4) "the type of operation . . . , including the composition, structure, and functions of the workforce."  42 U.S.C. § 12111(10)(B).

DYRS argues that it was not required to provide the best accommodation available, only an effective one, and that it provided Plaintiff with an accommodation that met the two accommodation requests DYRS was capable of providing: avoiding work with McInnis and White-Pulley, and having the flexibility to attend medical appointments.

This argument fails for two reasons.  First, DYRS had an obligation to engage in the interactive process in order to determine whether providing the requested accommodation would cause an "undue hardship."  42 U.S.C. § 12112(b)(5)(A); *see* 29 C.F.R. § 1630.2(o)(3).  DYRS has not proffered evidence that allowing Plaintiff to work from 6:30 a.m. to 3:00 p.m. (i.e., exempting her from the overtime requirement and/or allowing liberal leave) in order to attend afternoon counseling sessions would have caused such a hardship.  Indeed, as discussed above, there is evidence that DYRS exempted other employees from the overtime work "requirement." Therefore, there is a disputed issue of material fact as to whether providing Plaintiff with a reasonable accommodation in the form of exemption from overtime work and/or use of liberal leave would have caused DYRS undue hardship.

### 3.  Position/Location Transfer

Even if DYRS had granted the eight-hour scheduling accommodation Plaintiff requested, her request to avoid contact with McInnis and White-Pulley would have remained unresolved. Plaintiff alleges that DYRS could have provided this accommodation by transferring her to a position at one of two other DYRS locations.  (Pls. Br. 25; Pls. SMF ¶ 16; Ward Dep. 45–47, 100–101; Ohler Dep. 26–28).  Moreover, Ohler testified that DYRS could have transferred

Plaintiff "depending on the needs of the facility" or "if there were a vacancy." (Ohler Dep. 26, 28, 30). Defendant responds that Plaintiff has failed to establish there was a position available.

Employers are prohibited from discriminating on the basis of disability, and the ADA defines disability discrimination to include

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. 42 U.S.C. § 12112(b)(5)(A). Under the ADA's scheme, then, it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question "would impose an undue hardship on the operation of the business" of the employer.

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1300 (D.C. Cir. 1998).

A "reasonable accommodation" "may include . . . job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position . . . ." 42 U.S.C. § 12111(9) (emphasis added). Although not binding, EEOC regulations provide that "reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship." 29 C.F.R. app. § 1630.2(o).

Given the facts presented in this case, the court will deny summary judgment on the position transfer accommodation request. While Plaintiffs must act proactively when requesting accommodations, so must the employer. Indeed, the EEOC takes the following position with respect to the question of whether the employer has a duty to identify vacant positions or whether the employee has a duty to learn of vacant positons:

> Does an employer have to notify an employee with a disability about vacant positions, or is it the employee's responsibility to learn what jobs are vacant?
>
> The employer is in the best position to know which jobs are vacant or will become vacant within a reasonable period of time. In order to narrow the search for potential vacancies, the employer, as part of the interactive process, should ask the employee about his/her qualifications and interests. Based on this information, the

employer is obligated to inform an employee about vacant positions for which s/he may be eligible as a reassignment.  However, an employee should assist the employer in identifying appropriate vacancies to the extent that the employee has access to information about them.  If the employer does not know whether the employee is qualified for a specific position, the employer can discuss with the employee his/her qualifications.

U.S. Equal Emp't Opportunity Comm'n, No. 915.002, Enforcement Guidance: Reasonable

Accommodation and Undue Hardship Under the American with Disabilities Act, Reassignment

Question 28 (Oct. 17, 2002), 2002 WL 31994335, at *23 (footnote omitted).

Similarly, as the Court noted in *Aka v. Washington Hospital. Center*, 156 F.3d 1284,

1304 n.27 (D.C. Cir. 1998):

Under the applicable caselaw, it is true that Aka had an obligation to demonstrate that there existed some vacant position to which he could have been reassigned. *See, e.g., McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1165 (7th Cir. 1997). On the other hand, WHC had a corresponding obligation to help him identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies).  *See, e.g., Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 677 (7th Cir.1998) ("[T]he ADA places a duty on the employer to 'ascertain whether he has some job that the employee might be able to fill.' ") (quoting *Miller v. Illinois Dep't. of Corrections,* 107 F.3d 483, 487 (7th Cir.1997)); *Mengine v. Runyon,* 114 F.3d 415, 419–20 (3d Cir. 1997).

Although the facts in *Aka* are distinguishable,[6] this language and the EEOC guidelines suggest

that an employee's obligation to seek reassignment and the employer's obligation to assist or

consider reassignment must be weighed against each other based on the circumstances of each

case.  In the present case, it is unclear the extent to which there were vacant positions for which

Plaintiff was qualified and, if such positions existed, the extent to which to DYRS could have

---

[6]  In *Aka*, the plaintiff requested a transfer as an accommodation, but the employer declined and informed plaintiff he was responsible for reviewing the vacant job listings and applying for jobs that could accommodate his disability.  *Aka*, 156 F.3d at 1286.  When plaintiff applied for jobs that he was qualified to perform, the hospital hired less senior applicants, even though the plaintiff had "excellent" evaluations and had been described as "highly intelligent and motivated."  *Id*. at 1287.

transferred Plaintiff without undue hardship.  Accordingly, DYRS is not entitled to summary judgment on the transfer issue.

Based on the foregoing, as regards Plaintiff's requests for accommodations, the court will grant summary judgement solely on Plaintiff's attempt to avoid weekend work.   In all other respects, the court will deny Defendant's motion for summary judgment on the reasonable accommodations claim.

### B.  Retaliation (Count II)

To establish a *prima facie* case of retaliation, a plaintiff must show "first, that she engaged in protected activity; second, that she was subjected to adverse action by the employer; and third, that there existed a causal link between the adverse action and the protected activity." *Broderick v. Donaldson*, 437 F.3d 1226, 1231–32 (D.C. Cir. 2006) (quoting *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005)).  It is undisputed that Plaintiff engaged in protected activity on at least two occasions.  First, she filed a lawsuit against DYRS in 2010 asserting gender based harassment and retaliation associated with her complaints to management about McInnis and White-Pulley.  *See Ward*, 950 F. Supp. 2d at 11–13.  That lawsuit was ongoing when she sought the accommodations at issue here, and her request for accommodation was itself protected activity.  *See Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 77 (D.D.C.  2009) ("Requests for accommodation are 'protected activities' within the meaning of the ADA.") (citation omitted).

Plaintiff alleges that, as a result of her protected activity, DYRS retaliated against her by:

- Denying her accommodation requests;

- Making it difficult for her to attend medical appointments by requiring that she work shifts in excess of eight hours and denying her requests for leave;

- Threatening her with discipline if she did not report for the midnight shift and then sending her home after she did report;

- Placing her in "regular" contact with McInnis;

- Continually reassigning her to different parts of the Agency;

- Failing to pay her for administrative leave by retroactively designating approved paid leave as unpaid FMLA leave; and

- Requiring her to submit additional medical information and a Fitness-for-Duty Examination.

(Pls. Br. 7, 14-15; Pls. SMF ¶¶ 32, 36).

### 1.   Plaintiff's Requests for Reasonable Accommodations

The court finds no support for Plaintiff's allegation that weekend work constituted retaliation.  Plaintiff's admitted ability to work weekends, which was approved by her therapist, belies any suggestion that she suffered an adverse employment action when DYRS denied her request to avoid weekend work.

In contrast, the court finds sufficient evidence to support Plaintiff's claim that DYRS retaliated against her by requiring her to be available to work more than eight hours daily and refusing to grant her leave to attend medical appointments.  As discussed above, DYRS exempts employees from the overtime requirement on a case-by-case basis.  (Ohler Dep. 32).  Therefore, requiring Plaintiff to work overtime when others were given exemptions is sufficient to raise an inference of retaliation.  Moreover, the agency has not come forward with any justification for flatly denying Plaintiff's repeated requests for leave to attend medical appointments.  (*See* Ward Dep. 8–9, 72–73, 76).

Likewise, as discussed above, there is insufficient evidence to grant summary judgment on whether transferring Plaintiff so as to avoid contact with McInnis and White-Pulley would have been viable.  Inasmuch as Plaintiff's lawsuit against DYRS was ongoing at the time of the

challenged conduct and because that lawsuit directly related to Plaintiffs' allegations involving

alleged harassment by those two co-workers, a reasonable fact-finder might determine that

failing to transfer Plaintiff was retaliatory.  Accordingly, the court will grant summary judgment

on the reasonable accommodations retaliation claim solely as it relates to Plaintiff's request for

exemption from weekend work.

### 2.   Failing to Pay Plaintiff for Administrative Leave

Plaintiff next alleges that DYRS retaliated against her by "retroactively applying FMLA

leave to approved sick leave used several months prior."  (Pls. SMF ¶ 32).  The precise nature of

this claim is unclear.  It appears that DYRS initially approved Plaintiff's request for leave <u>with</u>

<u>pay</u> but, after she requested reasonable accommodations, the agency later reclassified a portion

of her leave as <u>unpaid</u> FMLA.  (*See* Pls. Ex. 31; Ward Dep. 90).  It appears from the record,

however, that Plaintiff was on paid leave when she requested FMLA leave and, consequently,

her <u>conversion</u> to FMLA leave could not have been retaliatory.  (S*ee* Pls. Ex. 26; *see* Am.

Compl. ¶¶ 17–18).  What is unclear is whether the purported retroactive application of the

FMLA leave occurred according to DYRS policy, the extent to which any such policies were

applied in a retaliatory manner, or the extent to which the entire incident resulted from Plaintiff's

misunderstanding about the implications of requesting FMLA leave.

In any event, viewing the facts in the light most favorable to Plaintiff, it appears that there

is a disputed issue of fact as to whether she was unfairly denied compensation for paid leave that

DYRS had previously approved, and DYRS does not sufficiently address this issue in its reply

brief or in its response to Plaintiff's Statement of Material Facts.  (*See* Pls. Ex. 31; Ward Dep.

90).  Instead, DYRS simply asserts that Plaintiff's uncorroborated self-serving testimony does

not create a genuine issue of material fact, and cites to the opinion in Ward's earlier lawsuit in

support of this position.  (Defs. Response to Pls. SMF ¶ 37) (citing *Ward*, 950 F. Supp. 2d at 17).

But in Ward's prior lawsuit, the court noted that Plaintiff's testimony that DYRS retaliated

against her (by forcing her to work up to sixteen hours a day) was insufficient to establish

discrimination in light of documented evidence from DYRS to the contrary.  *Ward*, 950 F. Supp.

2d at 16–17.  DYRS has not cited to any such documented evidence in the present case, and

therefore cannot rely on *Ward*.

While DYRS may have had a legitimate reason for its actions, without any evidence in

the record explaining why DYRS failed to pay Plaintiff for what she asserts was pre-approved

paid administrative leave, a reasonable fact-finder could determine that DYRS acted with

retaliatory motive.  Therefore, DYRS' motion for summary judgment as to that claim will be

denied.

### 3.      Reassignments

Plaintiff alleges that DYRS retaliated against her by continually reassigning her to

different positions within the agency upon her return from leave.  (Pls. SMF ¶ 32).  Plaintiff does

not support her allegation with evidence of retaliatory motive, however.  She does not provide

any comparator evidence, nor does she point to any policy that might indicate such

reassignments were unusual.  Therefore, she has not presented any evidence from which a

reasonable fact-finder could determine that the reassignments were retaliatory.  Therefore, the

court will grant summary judgment on this claim.

### 4.      Midnight Shift Incident

Plaintiff alleges that DYRS retaliated against her when, under "threat of disciplinary

action," she returned from leave in order to work the midnight shift, and was then sent home.

(Pls. SMF ¶ 19).  Plaintiff has not pointed to any evidence, however, that might indicate the

incident was retaliatory.  As discussed above, the agency's correspondence with Plaintiff indicated she should contact the agency to make arrangements to return to work on September 2. (Pls. Exs. 25, 27).  She responded by informing DYRS that she would not be able to return to work on September 2 and requested FMLA leave.   (Am. Compl. ¶ 27).   Her therapist subsequently sent a letter to DYRS explaining that Plaintiff was unable to work the midnight shift.  (Pls. Ex. 13).  Although it is unclear what transpired between the date of that letter and the day Plaintiff showed up to work the midnight shift, there is no indication that Plaintiff ever confirmed she planned to accept the midnight shift offer.  When asked during her deposition whether she ever contacted the manager who sent the letter, Plaintiff testified that she did speak with the manger.  (Ward Dep. 60).  But, when asked if she accepted the offer of the midnight shift accommodation, Plaintiff responded:  "I didn't – I did – I can't recall exactly what occurred after [the letter].  What I do know is that I did report to work on the midnight shift and was sent home."  (*Id*.)  Without evidence that DYRS was aware Plaintiff intended to accept its offer and show up for the midnight shift, or evidence that DYRS treated other employees more favorably under similar circumstances, there is nothing untoward or retaliatory about the agency's response to Plaintiff's unexpected arrival at work.  Accordingly, Plaintiff's retaliation claim fails on the midnight shift issue.

### 5.    Fitness for Duty Examination

Plaintiff alleges that, after the midnight shift incident, DYRS retaliated against her by requiring that she submit to what she calls a Fitness-for-Duty "examination."   (Pls. Br. 8).  She contends this requirement was retaliatory for two reasons.  First, an agency official admitted that the Fitness-for-Duty requirement was not mandatory, but was imposed on a "case-by-case" basis.

(Ohler Dep. 44).  Second, Plaintiff contends the requirement was retaliatory because the agency "had never required one before from anyone."   (Ward Dep. 69; *see* Pls. SMF ¶ 30).

As an initial matter, the court notes that, according to the evidence presented, the agency did not in fact require that the Plaintiff undergo an "examination."  (*See* Ward Dep. 69).  Ward testified that the agency gave her documents that she gave to her physician for the purpose of certifying that she was capable of preforming her duties.  (*Id.*)  Additionally, despite Plaintiff's contention to the contrary, there is evidence that the agency had previously required that at least one other person undergo the examination.  (*See* Ohler Dep. 43–44).

Despite these clarifications, the court finds that the Plaintiff has presented just enough evidence to support her retaliation claim as it relates to the examination.  While DYRS correctly argues that it may legally request additional information from employees who request accommodations, this argument ignores the fact that the agency had already received information from Plaintiff's medical providers:  On July 24, 2012 one of her medical providers sent a letter to DYRS explaining that Plaintiff was "doing very well" and would be released to return to work on Monday August 6, 2012, with accommodations.  (Pls. Ex. 10).  Another letter followed on July 27, explaining that Plaintiff was "compliant with her treatment plan," and was able to "return to work" with accommodations.  (Pls. Ex. 11).  DYRS has not explained why these two letters were insufficient; while the agency may have had legitimate reasons for requesting additional information, the agency has not presented any evidence in support of its request.  Moreover, a DYRS representative testified that the agency requires the examination on a "case-by-case" basis, but she could only remember one person, besides Plaintiff, whom the agency had required to submit to the examination.  (Ohler Dep. 43–44).  Given Plaintiff's prior protected

activity, a reasonable fact-finder might determine that in this instance the examination requirement was retaliatory.

In light of these findings, the court will grant summary judgment on the retaliation claim as it relates to: (1) the request to avoid weekend work; (2) Plaintiff's repeated reassignments; and (3) the midnight shift incident.

### C. Hostile Work Environment (Count III)

Finally, Plaintiff claims she was subjected to a hostile work environment. A plaintiff may prevail on a hostile work environment claim if she shows "that [her] employer subjected [her] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (internal quotation marks omitted). In considering a claim of hostile work environment, the court must consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). "The constituent acts must be 'adequately linked' such that they form 'a coherent hostile environment claim.'" *Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). The standard is an objective one, *Baird*, 792 F.3d at 172 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), and it is viable only if the conduct complained of is so "extreme to amount to a change in the terms and conditions of employment." *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher*, 524 U.S. at 788).

Plaintiff's hostile work environment claim involves largely the same allegations she relies upon to support her retaliation claim: denial of her request to avoid contact with McInnis and White-Pulley, denial of her requests for leave to attend medical appointments, requiring that

she submit the fitness-for-duty paperwork, multiple reassignments, and previously approved paid leave that was suddenly converted to unpaid leave.  Additionally, Plaintiff supports her hostile work environment claim by pointing to a derogatory comment made by a co-worker, who said "no one is going to listen to you because you are crazy." (Pls. Ex. 31).  Finally, Plaintiff argues that the unreasonably long delay in providing a reasonable accommodation constituted a hostile work environment.

Given the evidence presently before the court, summary judgment is not appropriate on Plaintiff's hostile work environment claim.  Plaintiff alleges that DYRS repeatedly forced her to work overtime and denied her leave requests, thereby making it difficult or impossible to make her therapy appointments.  Additionally, Plaintiff's health care providers indicated that regulating her sleep was essential to improving her cognitive condition, but Plaintiff alleges that the forced overtime exacerbated her sleep problems.  Plaintiff also alleges that DYRS kept her in a position where she might encounter McInnis and White-Pulley at any time.  While she only remembered encountering at least one of those co-workers on three occasions between October 2012 and August 2014, she contends that she suffered a "mental breakdown" each time she saw one of them.   Finally, Plaintiff asserts that DYRS demanded that she submit more medical documentation than other employees requesting accommodations, failed to pay her for leave that had apparently been approved as paid leave, and took an unreasonably long time to reach a decision about her requests for accommodations.  Viewing the evidence in the light most favorable to Plaintiff, and given her documented mental health issues, such conduct certainly could have "alter[ed] the conditions of [her] employment and create[d] an abusive working

environment." *See Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).  Accordingly, the court will deny summary judgment to DYRS on Plaintiff's hostile work environment claim.[7]

## IV.    CONCLUSION

For the foregoing reasons, the court will grant summary judgment on Plaintiff's reasonable accommodations claim (Count I) as it relates to her request for exemption from weekend work.  The Court will also grant summary judgment on her retaliation claim (Count II) as it relates to her request for exemption from weekend work, her allegations about repeated work reassignments and the midnight shift incident.   In all other respects, the court will deny DYRS's motion.


Date:  September 30, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[7]   The court notes that Plaintiff's Statement of Facts includes multiple instances where the paragraph simply states a legal proposition and then cites to numerous places in the record to support that proposition, but the paragraph does not set forth the specific facts supporting the proposition.  (*See, e.g.,* Pls. SMF ¶¶ 18, 31.)  Going forward, counsel are reminded that the Statement of Facts shall contain specific factual allegations.  Moreover, in paragraphs where multiple factual allegations are included (*see, e.g.*, Pl. SMF ¶ 32), citations to the record shall follow each factual allegation, rather than at the end of the textual sentence.  Failure to comply with these guidelines, the Local Rules of this court, the Federal Rules of Civil Procedure or any court orders may result in the court striking the non-complaint pleading.